# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

JAMES EDWARD POOLE,

          Defendant.

No. CR13-3003-MWB

**ORDER REGARDING MAGISTRATE'S REPORT AND RECOMMENDATION CONCERNING DEFENDANT'S MOTION TO SUPPRESS**

_____

## TABLE OF CONTENTS

**I.     INTRODUCTION AND BACKGROUND**............................................................. 2
    **A.     Procedural Background** ........................................................................ 2
    **B.     Factual Background** .............................................................................. 3

**II.    LEGAL ANALYSIS** ........................................................................................ 9
    **A.     Standard Of Review**............................................................................. 9
    **B.     Objections To Report And Recommendation** ................................... 14
        **1.     Length of traffic stop**.................................................... 14
        **2.     Reliability of drug-detection dog** ................................... 18

**III.   CONCLUSION** ............................................................................................... 21

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On January 13, 2013, an Indictment was returned against defendant James Edward Poole and a co-defendant, charging conspiracy to distribute 500 grams or more of a substance or mixture containing methamphetamine which contained 50 grams or more of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846, possessing with intent to distribute 50 grams or more of a substance or mixture containing methamphetamine which contained 5 grams or more of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Defendant Poole filed a motion to suppress in which he seeks to suppress evidence seized during a search of the automobile in which he had been a passenger. He contends that his Fourth Amendment right against unreasonable searches and seizures was violated by law enforcement's stop and search of the vehicle. Specifically, Poole argues that there was no probable cause to stop the vehicle because the state trooper who conducted the traffic stop did not witness a traffic violation. Second, he argues the expansion of the traffic stop was impermissible because the trooper merely stalled for the canine to arrive and had no reasonable suspicion of any criminal activity. Third, Poole argues the length of detention while waiting for the canine was unreasonable. Finally, Poole contends that the dog sniff was unreliable and did not establish probable cause to justify a search of the vehicle.

The prosecution filed a timely resistance to Poole's motion. Poole's motion to suppress was referred to United States Magistrate Judge Leonard T. Strand, pursuant to 28 U.S.C. § 636(b). On March 27, 2013, and April 3, 2013, Judge Strand conducted an evidentiary hearing and subsequently filed a Report and Recommendation in which he recommends that Poole's motion to suppress be denied. In his Report and

Recommendation, Judge Strand concluded that the trooper's observation of a traffic violation, a broken tail light, created probable cause for the initial stop. Judge Strand further concluded that, based on the totality of the circumstances, the trooper had reasonable suspicion to expand the scope of the traffic stop to investigate whether the automobile's occupants were transporting contraband. Judge Strand also found that the length of the traffic stop was reasonable. Judge Strand further determined that Poole did not challenge the reliability of the drug-detection dog in his motion. Nonetheless, Judge Strand chose not to find that Poole had waived his right to challenge the reliability of the drug-detection dog and proceeded to address the merits of Pool's argument on this issue. Judge Strand concluded that the drug dog was reliable and its alert on the automobile established probable cause to justify its search. Therefore, Judge Strand recommended that Poole's motion to suppress be denied.

Defendant Poole has filed objections to Judge Strand's Report and Recommendation. The prosecution filed a timely response to Poole's objections. I, therefore, undertake the necessary review of Judge Strand's recommended disposition of Poole's motion to suppress.

### B.    Factual Background

In his Report and Recommendation, Judge Strand made the following factual findings:

> On January 8, 2013, at approximately 11:00 p.m., Trooper David Saldivar was traveling northbound on Iowa Highway 17 when he noticed a vehicle traveling southbound with a broken taillight. He testified that it was "showing white to the rear" and also appeared to be dim. He turned around, stopped the vehicle and approached the passenger side window. He requested insurance and driver's licenses from both occupants and noticed the driver had a "long lost look." He asked the driver, Shannon Poole, to come back

3

to his vehicle. She agreed. James Poole, the defendant, waited in the passenger seat. While Shannon was in the patrol car, Officer Michael Pruismann with the Ellsworth/Jewell/Stanhope Police Department arrived and asked if Saldivar needed assistance. Saldivar asked Pruismann to run the driver's licenses and speak to James while he spoke to Shannon in his patrol car.

Shannon told Saldivar she was planning to get the broken taillight fixed in Des Moines. Saldivar asked where they had been that evening and she answered that they had been at a friend's house in Webster City. When Saldivar asked for the friend's name, Shannon was slow to respond, said she was just visiting friends, and upon further questioning eventually stated her friend's name was Sam. Shannon did not know where Sam lived in Webster City, just that she lived in an apartment. She said they were there "not that long." Shannon asked if she was going to get a ticket and Saldivar told her "no," but he did issue her a warning or "fix-it ticket." *See* Government Ex. 3. This happened at approximately 11:08 p.m.

Saldivar told Pruismann about Shannon's evasiveness in answering his questions. Pruismann then went to speak to James from the passenger side of the stopped vehicle. When he approached, he noticed James stuffing something into a plastic ashtray in the vehicle. James told Pruismann they had been at Jeremy's house in Webster City all day watching movies and had picked up fast food before heading back home to Boone. Saldivar and Pruismann then compared the stories they had received from the Pooles and noticed inconsistencies about where they had been, what they had been doing and how long they had been there.

Saldivar testified that he had concerns about whether Shannon was impaired. Back in the car, he asked her about marks or scabs on her arms that, based on his training, appeared consistent with drug use. She said she had been cut by a nail on a door. He then asked why she was shaking so much, referring to her hands. She said she was cold and

they always shake like that. While it was cold and windy that night, Shannon was wearing a short-sleeved shirt with no jacket. Saldivar noted that Shannon's pupils appeared to be normal.

The insurance information initially provided to Saldivar was expired but Shannon said James had the valid insurance information in his billfold. Saldivar retrieved it from James and returned to his own vehicle. He then asked Shannon more questions about their activities that day. She was not sure what time they had left Boone to go to Webster City, but estimated it was around 8:00 p.m.

When Saldivar returned the insurance information to James he asked where they had been. James told him they had been at Jeremy's house. He reported that Jeremy's girlfriend's name is Sam. He said they stopped to get some food before driving back. Trooper Saldivar asked how long they had been at Jeremy's and James told him about an hour. He then elaborated on their activities that day.

By this time, Pruismann had relayed to Saldivar the information from Hicok that the Pooles were mentioned during an intelligence meeting as possible drug traffickers. Pruismann asked Saldivar "Is she tweaking?" Saldivar said "it looked like it" and the two of them discussed bringing a canine to the scene. Saldivar asked Pruismann to find out where the nearest dog was located and said he would get a better look at Shannon when he was in the car. This happened at 11:21 p.m.

Back in the car, Saldivar asked Shannon more about how her taillight had been damaged. She explained it had happened about two to three weeks earlier when someone had borrowed her car and backed into something. Saldivar got out of the car, told an officer "she's acting goofy" and said he was going to run her through some field sobriety tests. It turns out that the nearest available canine was in Boone County. Hicok called for the canine unit at 11:24 p.m.

When he returned to his car, Saldivar told Shannon that he wanted to explain why things were taking so long. He told her their stories were not matching up and he did not think a reasonable person would drive the distance from Boone to Webster City, stay for an hour and then come right back home. Shannon explained that her friend was fixing her computer and then they got food. When asked if she had had anything to drink or had taken any illegal narcotics, she answered "no." Saldivar requested that she submit to field sobriety tests and said if he did not see any indications he would have her back on the road as soon as possible.

He first performed a horizontal gaze test, which Shannon passed, but she had some difficulty with a different eye test. She then failed the Romberg test, having counted to 30 seconds in her head within 15 timed seconds. Saldivar exited the vehicle and spoke to another officer about the tests. That officer suggested Saldivar check her pulse and look in her nostrils.

Saldivar returned to his car and explained that he needed to perform two more tests because he was not sure whether the results indicated narcotics use or general nervousness. He noticed she was sweating profusely and when he asked why, she said she was hot. He pointed out that she said she was shaking earlier because she was cold. Shannon said she got hot when he turned on his heat and she warmed up quickly. Saldivar then asked to look in her nostrils and take her pulse. Her pulse was 124, which he told her was very high. Shannon stated that her pulse rate is usually high when she visits the doctor.

Saldivar spoke with another officer about the tests and described what he considered to be positive indications. He then returned to his car and asked Shannon when she had last used methamphetamine. She said she had never used anything, except that she had smoked marijuana when she was 15 or 16. When asked about any prescription medication she was taking, she listed three types taken for a

compression fracture in her spine, muscle spasms and arthritis.

The canine, Bandit, and his handler, Deputy Dallas Wingate, arrived at approximately 11:50 p.m. Saldivar told Wingate that a traffic stop had taken place and that after talking to each of the occupants he believed narcotics were in the vehicle. He asked Wingate to deploy the canine. Before that happened, James was asked to leave the Poole vehicle and he exited from the passenger side. The doors of the vehicle were closed when Wingate approached it with Bandit.

Wingate began at the front passenger side of the vehicle and ran Bandit around the front, up the driver's side, around the rear and down the passenger side to the front of the vehicle. Wingate testified it was very windy that evening, estimating 20 to 30 mph from the west-northwest (blowing from the passenger side of the south-facing vehicle to the driver's side).

During the first pass around the vehicle, Wingate noticed that Bandit's body posture, intensity and focus immediately changed while they were on the driver's side of the vehicle. Based on his experience with Bandit he believed the dog smelled narcotics on that side. He took Bandit around the vehicle several more times, each time observing that as they came around to the driver's side of the vehicle, Bandit's behavior changed. At one point, Bandit tried to crawl under the vehicle and then turned around trying to look up, which Wingate interpreted as meaning there was narcotics odor in that area. Bandit worked his way to the rear of the vehicle and alerted on the broken taillight of the vehicle by pawing on it, trying to bite it and then stepping back and barking at Wingate.

At this point, Wingate told Pruismann the dog had alerted and both officers proceeded to the passenger side and deployed Bandit inside. When Bandit entered the vehicle, he stood on the floor by the passenger seat and leaned

forward near the floor by the console. He took a deep breath and started biting and pawing at the console. Wingate said he recognized this as an alert to that area. He also noticed Bandit was standing on a purse with his front paws. He did not want the dog to disturb anything in the purse, so he moved Bandit to the driver's seat. Bandit then jumped in the back seat and Wingate saw him try to wedge himself down on the floor and squeeze under the front passenger seat towards the spot where he had previously indicated. Wingate removed Bandit from the car and told Pruismann to look at the area in front of the passenger seat along the console.

Pruismann conducted an interior search of the vehicle in this area. When he picked up the purse, its magnetic flap flipped open and a glass pipe with white residue fell out. He also noticed there was a white plastic bag in the purse, which appeared to hold methamphetamine. James and Shannon Poole were placed under arrest and transported to the Hamilton County jail. Saldivar testified that Shannon was arrested for driving while impaired but the charge was later dismissed. Meanwhile, the vehicle was towed to the Hamilton County Sheriff's Office so it could be searched in a climate-controlled location. Warrants were obtained from a state court magistrate. Ultimately, methamphetamine and a stolen handgun were found.

As the traffic stop was concluding, Wingate told the others officers that Bandit is a better tracking dog than a drug dog. At the hearing, Wingate stated that he was simply advertising to the officers that Bandit was available to assist with tracking as well as drug detection.

Report and Recommendation at 7-8. Upon review of the record, I adopt all of Judge Strand's factual findings.

## II. LEGAL ANALYSIS

### A. Standard Of Review

I review the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see* FED. R. CIV. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required

"to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen de novo review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has been willing to "liberally construe[]" otherwise general pro se objections to require a de novo review of all "alleged errors," *see Hudson v. Gammon*,

46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full de novo review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a de novo review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to me that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide de novo review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). I am unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost"

principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").  In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary:  a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed.  *See Thomas*, 474 U.S. at 153-54.  Thus, while a clearly erroneous standard of review is deferential and the minimum standard

appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[1]

---

[1]The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. See *United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g., United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions de novo." (citation omitted)).

As noted above, Poole has filed objections to Judge Strand's Report and Recommendation. I, therefore, undertake the necessary review of Judge Strand's recommended disposition of Poole's motion to suppress.

## B.    Objections To Report And Recommendation

### 1.    Length of traffic stop

Poole objects to Judge Strand's conclusion that the length of the traffic stop was reasonable. Poole argues that his detention was unreasonably extended once the fix-it ticket was issued.

The Eighth Circuit Court of Appeals recently explained that:

> After a law enforcement officer initiates a traffic stop, the officer "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004). These tasks include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning. *Id.* at 528–29. An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary. *United States v. McCarty*, 612 F.3d 1020, 1024–25 (8th Cir. 2010). However, once an officer finishes these tasks, "the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention' or unless the continued encounter is consensual." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). "Whether a particular detention is reasonable in length is a fact-intensive question." *United States v. Suitt*, 569 F.3d 867, 871 (8th Cir. 2009) (quoting *United States v. Olivera–Mendez*, 484 F.3d 505, 510 (8th Cir. 2007)). "Reasonableness . . . is measured in objective

> terms by examining the totality of the circumstances." *Id.*
> (quoting *United States v. $404,905.00 in U.S. Currency*,
> 182 F.3d 643, 646 (8th Cir. 1999)).

*United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013).

I find that Trooper Saldivar's expansion of the traffic stop was justified. "[T]he reasonableness of a detention may be determined in part by 'whether the police are diligently pursuing a means of investigation which is likely to resolve the matter one way or another very soon. . . .'" *Michigan v. Summers*, 452 U.S. 692, 701 n.14 (1981) (quoting 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2, p. 40 (1978)); *see also United States v. Maltais*, 403 F.3d 550, 557 (8th Cir.2005) ("In assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."). As recounted above, Trooper Saldivar initially performed routine tasks associated with a traffic stop. He asked the driver, Shannon Poole, and the passenger, Poole, for their driver's licenses. He also asked Shannon for proof of insurance, and requested that she sit in his patrol car. The traffic stop was lengthened for a short period because Shannon only had an expired proof-of-insurance card, and Trooper Saldivar had to obtain a valid proof-of-insurance card from Poole. *See United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) ("When there are complications in carrying out the traffic-related purposes of the stop . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine."). Once Officer Pruismann arrived at the scene, Trooper Saldivar requested that Officer Pruismann conduct license checks on both Shannon and Poole. Trooper Saldivar also asked that Officer Pruismann speak to Poole while he spoke with Shannon. When Trooper Saldivar and Officer Pruismann compared the stories given to them by Shannon and Poole about their actions that day, the officers noticed inconsistencies about where they had been, what they had been doing, and how long they had been there. Trooper Saldivar and Officer Pruismann's actions were entirely reasonable.

"'An officer may also question a vehicle's passengers to verify information provided by the driver, and conflicting stories may provide justification to expand the scope of the stop and detain the occupants.'" *United States v. Sanchez,* 417 F.3d 971, 975 (8th Cir. 2005) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (citations omitted)); *see United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (noting a reasonable traffic stop investigation includes checking the driver's license, the vehicle's registration, inquiring about the occupants' destination, route, and purpose, and verifying the driver's story with passengers); U*nited States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003) (holding that conflicting stories may provide justification to expand the scope of the stop and detain the occupants).

The Pooles' conflicting stories coupled with Trooper Saldivar's observations of Shannon caused him to suspect that she was under the influence of drugs. She had what Trooper Saldivar described as "a long-lost look." He also noticed that she was very nervous, shaking, and had clammy skin. When Trooper Saldivar asked her about this she claimed to be cold. Later Trooper Saldivar noticed that she sweating profusely. Shannon now claimed to be hot. Trooper Saldivar also noticed what he judged to be track marks on Shannon's arms. "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) (citing *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001)). Trooper Saldivar's suspicions were further heightened by information he received from Officer Pruismann, via Deputy Hickok, that the Poole had been mentioned during a law enforcement briefing as possible drug traffickers. In making this determination, I consider the collective knowledge of all of the officers involved, not merely "'the information within the knowledge of the officer on the scene if there is some degree of communication.'" *United States v. Morales*, 238 F.3d 952, 954 (8th

Cir.2001) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)); *see United States v. Thompson*, 533 F.3d 964, 969 (8th Cir.2008) (collective knowledge of all officers involved in investigation can be imputed to the officer who initiates the traffic stop if there is communication between the officers).

Based on his observations and the information he had received about the Pooles, Trooper Saldivar strongly suspected that Shannon was impaired by drugs and/or possessed drugs. At this point, he had Deputy Hickok call for a canine unit. Hickok called for the canine unit at 11:24 p.m., approximately 24 minutes after the initial stop, but before Trooper Saldivar had conducted field sobriety tests on Shannon. Trooper Saldivar completed his field sobriety tests on Shannon at 11:31 p.m. Shannon's mixed results on the tests did not eliminate Trooper Saldivar's suspicions but added to them.

Trooper Saldivar called for a drug-detection dog because he continued to suspect that Shannon was impaired by drugs and/or possessed drugs. The canine unit arrived approximately 20 minutes after Shannon's field sobriety testing was completed. "'[U]nder the proper circumstances, [the Eighth Circuit has] considered delays for dog-sniffs far in excess of 90 minutes reasonable.'" *United States v. Riley*, 684 F.3d 758, 765 (8th Cir. 2012) (quoting *United States v. Donnelly*, 475 F.3d 946, 953–54 (8th Cir. 2007)); *see also United States v. Maltais*, 403 F.3d 550, 557–58 (8th Cir. 2005) (finding three-hour delay to allow drug-detection dog to reach remote location was reasonable because officers "acted with diligence and pursued the quickest and least intrusive means of investigation reasonably available"); *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (eighty minute detention was not unreasonable while awaiting the arrival of a drug-detection dog where the officer "acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available dog"); *see also United States v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007) (holding that thirty-one-minute wait for arrival of drug-detection dog was neither excessive nor unreasonable

extension of traffic stop). As the Eighth Circuit Court of Appeals has explained, the length of a permissible delay must take into consideration the circumstances of the stop, "[w]hen police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. Courts must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994). I find the wait for the canine unit here was unavoidable because the traffic stop occurred in Hamilton County but the canine unit was in Boone County, one county to the south. *See White*, 42 F.3d at 460. Thus, I find that Trooper Saldivar's expansion of the traffic stop was justified and the length of the traffic stop reasonable. Poole's objection is denied.

### 2. *Reliability of drug-detection dog*

Poole also objects to Judge Strand's Report and Recommendation on the ground that the drug-detection dog was not reliable and the drug-detection dog's alert therefore failed to provide probable cause to search the automobile in which Poole was riding. Earlier this year, the United States Supreme Court considered how a court should determine if the alert of a drug-detection dog during a traffic stop provides probable cause to search the vehicle. *See Florida v. Harris*, 133 S. Ct. 1050, 1055–58 (2013). The Court reversed the Florida Supreme Court's requirement of "a strict evidentiary checklist, whose every item the State must tick off" in assessing a drug dog's reliability and treating a dog's field performance record as the standard in determining reliability. *Id*. at 1056. The Court observed that:

> If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the

dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

*Id*. at 1056–57. Based on this reasoning, the Court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust h[er] alert." *Id*. at 1057. Thus, under *Harris*, I may assume that Bandit, the drug-detection dog here, was reliable and provided sufficient probable cause to search the Pooles's automobile, based on his successful completion of training on November 23, 2012, and certification on that same date. *See id*.

Bandit's training and certification is not the end of the matter. A defendant still may contest the reliability of a drug-detection dog. *Id*. In *Harris,* the Court identified several ways for a defendant to challenge a drug-detection dog search. These include cross-examining the canine officer about the field history of the drug-detection dog, contesting the adequacy of the canine training program, and questioning the drug-detection dog's performance during the case at hand. *Id*. Here, defense counsel cross-examined Bandit's handler, Deputy Wingate, about Bandit's training and history. In addition, Poole presented expert witness Kyle Heyen. Heyen testified that Wingate committed errors while deploying Bandit and that Bandit did not genuinely indicate to the presence of drugs. Heyen, however, conceded that different trainers and certifiers

19

prefer different methods of dog deployment. He also acknowledged that there are no uniform, accepted standards of how an open air dog sniff should be conducted. While Heyen was trained and certified in all aspects of police dog detection certification, his certification expired in 1996. He stopped training and certifying dog teams in 2002.

I find that Heyen's testimony was successfully rebutted by the prosecution's experts, Sergeant Wendell Nope and Sergeant Jeffrey Hopkins. Notably, both Sergeants Nope and Hopkins have much more experience in canine training than Heyen. Indeed, Sergeant Nope trained and certified Heyen in 1991. Heyen conceded that he considers Sergeant Nope to be an expert in the field, yet Sergeant Nope's testimony as to deployment techniques did not match Heyen's. Sergeant Hopkins testified that he worked for the Niagara Regional Police Service for 35 years during which he was involved in developing that and other police department's canine programs. In addition, he was responsible for training and maintaining canine programs for 12 other police departments in the United States and Canada. He trained and certified Bandit and Wingate in October and November 2012. Hopkins praised Bandit and Wingate as a team. He testified that Bandit's operative conditioning was almost instantaneous and that Wingate enhanced Bandit's development based on his previous experience with another drug-detection dog. In discussing Bandit, Sergeant Hopkins testified: "He was automatic. He was that good." He also testified that Wingate's and Bandit's success rate as a team during training was one hundred percent. As for Wingate's deployment of Bandit during this traffic stop, Hopkins testified that he reviewed the video and saw no inappropriate handling or behavior inconsistent with the training he had provided. He also testified that Bandit indicated when he barked at Wingate. This testimony is particularly significant given Sergeant Hopkins's familiarity and experience with Bandit. Having "weigh[ed] the competing evidence", *see Harris*. 133 S. Ct. at 1058, I find that there was probable cause to trust Bandit's alert and

indication based on his training and history, and thus probable cause to search Poole's vehicle. Poole's objection is denied.

### III.    CONCLUSION

Therefore, for the reasons discussed above, I, upon a de novo review of the record, accept Judge Strand's Report and Recommendation and deny defendant Poole's motion to suppress.

**IT IS SO ORDERED**.

**DATED** this 22nd day of July, 2013.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA